IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

MOBILE ATTIC, INC., )
MA MANUFACTURING COMPANY, )
INC., and BAGLEY FAMILY )
REVOCABLE TRUST, )
                       )
       Plaintiffs, )
                       )
v. )
                       )
PETER L. CASH, CASH BROTHERS )
LEASING, INC., BRIDGEVILLE )
TRAILERS, INC., and BARFIELD, )
MURPHY, SHANK & SMITH, P.C., )
                       )
       Defendants. )
_____  CIVIL ACT. NO. 1:09cv24-MHT
                          (WO)
NATIONAL SECURITY GROUP, INC., )
                       )
       Intervenor Plaintiff, )
                       )
v. )
                       )
PETER L. CASH, BARFIELD, )
MURPHY, SHANK & SMITH, P.C., )
MOBILE ATTIC, INC., and BAGLEY )
FAMILY REVOCABLE TRUST, )
                       )
       Intervenor Defendants. )

**RECOMMENDATION OF THE MAGISTRATE JUDGE and ORDER**

**I.  INTRODUCTION**

      This case is about a promising business venture which did not turn out like its

principals hoped.  In 2007, James Bagley, on behalf of the Bagley Family Trust ("Bagley

Family Trust" or "the Trust"), executed a Stock Purchase Agreement ("SPA") under which

Bagley Family Trust acquired a majority interest in Mobile Attic, Inc. ("Mobile Attic" or "MA") from the original owners Peter and Russell Cash and National Security Group ("NSG").[1] After execution of the SPA, Bagley and Mobile Attic's new president, Tony Wax ("Wax") who was also Bagley's son-in-law, took over management of Mobile Attic. Soon, as will be explained in detail later, Bagley and the Trust became dissatisfied because they came to believe that the financial status and inventory of Mobile Attic had been misrepresented. NSG, one of the other stockholders, grew equally dissatisfied with the operation of the corporation, especially when NSG did not receive an additional premium for the shares of stock NSG sold because Mobile Attic failed to meet certain performance targets established in the SPA. This lawsuit ensued.

On January 9, 2009, plaintiffs Mobile Attic, MA Manufacturing Company, Inc. ("MAMCI"), and Bagley Family Trust filed a complaint against defendants Peter L. Cash ("Cash"), Cash Brothers Leasing, Inc. ("Cash Brothers"), Bridgeville Trailers, Inc. ("Bridgeville Trailers"), and the accounting firm of Barfield, Murphy, Shank & Smith, P.C. ("Barfield Murphy") alleging twelve counts of misconduct surrounding and arising out of the SPA. (Doc. # 1). The plaintiffs sought damages in excess of $7,858,681.25.

The SPA contained an indemnification provision in which the Sellers[2] agreed to

---

[1] Bagley purchased 45 shares of stock from NSG, and 8 shares of stock from Peter Cash and Russell Cash individually, for total ownership of 61 shares of stock.

[2] The SPA defines the "Sellers" as "**National Security Group, Inc**., a corporation located in Elba, Coffee County, Alabama ("Seller NSG"), **Peter L. Cash**, an individual and Alabama resident ("Seller PLC") (continued...)

"jointly and severally, indemnify, defend" and hold harmless the Purchaser[3] and the Purchaser's assigns "from and against all losses, damages, liabilities or expenses (including reasonable attorneys' fees and expenses)" suffered as a result of or arising from (1) any breach of a representation or warranty contained in the SPA; (2) any breach or default in the performance of any covenant or agreement in the SPA; or (3) "any fraud, fraud in the inducement or misrepresentation by *any* of the Sellers" regarding the SPA or any "agreements to be executed and delivered pursuant to" the SPA.  (Doc. # 164, Ex. 1 at 18, ¶ 6.3, 6.3.1, 6.3.2 & 6.3.3) (emphasis added).  Because NSG, as a Seller, was party to the SPA, and the plaintiffs sought indemnification from NSG for alleged misrepresentations made by Peter Cash about the value of MA, NSG sought permission to intervene in this case to allege claims against Peter Cash, Mobile Attic and Barfield Murphy.  (Doc. # 37).  On August 17, 2009, NSG intervened pursuant to Fed.R.Civ.P. 24(b)(1)(B).  (Doc. # 45).  In its intervenor complaint, NSG alleged that it was defrauded by Cash, "who made numerous misrepresentations about the Mobile Attic business to NSG while, at the same time, affirmatively concealing the actual facts from NSG."  (Doc. # 46 at 2, ¶ 1).  NSG asserted claims of fraud and fraudulent inducement against Cash and MA, a claim of negligence against MA and Barfield Murphy, and sought a declaratory judgment against Bagley Family

---

[2](...continued)
and Russell L. Cash, an individual and Alabama resident ("Seller RLC") (collectively, "Sellers").  (Doc. # 164, Ex. 1 at 1) (emphasis in original).

[3]  The SPA defines the Purchaser as "**James W. Bagley**, an individual and Texas resident, and/or his assigns ("Purchaser")."  (Doc. # 164, Ex. 1 at 1) (emphasis in original).

Trust.  (Doc. # 46).

On September 8, 2009, plaintiffs Bagley Family Trust and MA filed a counterclaim against NSG alleging breach of representations and warranties, breach of the SPA and seeking indemnification for their losses. (Doc. # 50).  On August 10, 2010, NSG sought leave to amend its intervenor complaint, and Bagley Family Trust and MA sought leave to amend their complaint and counterclaim.  (Docs. ## 81 & 83).  On August 13, 2010, the court granted the parties leave to amend their pleadings.  (Docs. # 86-88).

In their amended complaint, plaintiffs Bagley Family Trust and MA assert the following claims:

(1)     Cash Brothers Leasing breached its contract with MA by failing to deliver mobile storage containers in the quantities as promised;

(2)     Cash breached the SPA agreement;

(3)     Barfield Murphy negligently prepared financial statements, thereby placing an excessive value on MA's inventory, furniture, and equipment, with knowledge that MA intended to furnish the statements to Bagley during the course of negotiations to purchase a majority interest in the company;[4]

(4)     Cash misrepresented the number and value of mobile storage units owned by MA, its inventory, and the amount of MA's accounts and notes;

(5)     Cash engaged in securities fraud in violation of 15 U.S.C. § 78j(b)[5] and

---

[4]  The plaintiffs have settled with defendant Barfield, Murphy, Shank and Smith and the court has dismissed this count and this defendant.  *See* Doc. # 202.

[5]  15 U.S.C. § 78j(b) makes it illegal for an individual, through any means or instrumentality of
(continued...)

Rule 10b-5,[6] by means and instrumentalities of interstate commerce, when he made false statements of material fact to Bagley in connection with the purchase of MA stock;

(6)     Bridgeville breached its agreement with MA Manufacturing;

(7)     Cash misrepresented to Bagley and MA Manufacturing the value of Bridgeville assets being purchased by MA Manufacturing;

(8)     Cash and Bridgeville, using instrumentalities of interstate commerce, made false statements of material fact to Bagley in connection with the conveyance of stock in MA Manufacturing in violation of 15 U.S.C. § 78j(b) and Rule 10b-5;

(9)     Cash breached the guaranty agreement with Bagley;

(10)    MA Manufacturing is entitled to indemnity from Cash for incurred expenses related to unauthorized loans;

(11)    Mobile Attic is entitled to indemnity from Cash and Cash Brothers due to their presentation of a fake invoice to Trinity Bank; and

(12)    the plaintiffs request a declaration that they have a first priority lien on Cash's shares in the companies, as well as a judicial foreclosure of those liens.

(Doc. # 91).

The plaintiffs seek compensatory and punitive damages, and attorney's fees as well as declaratory and injunctive relief.[7]   (*Id*.)

---

[5](...continued)
interstate commence, to use manipulation or deception to sell securities.

[6] The Securities Exchange Commission enacted Rule 10b-5 to make it illegal to use any means or instrumentality of interstate commerce to engage in scheme to defraud another in connection with the sale or purchase of securities.  *See* 17 C.F.R. § 240.10b-5 (1994).

[7] The plaintiffs do not specify the amount of damages they seek in the amended complaint.

5

In its amended counterclaim against NSG, Bagley Family Trust and MA allege that (1) NSG made false representations and warranties about the value of MA to induce Bagley Family Trust to enter into the SPA; (2) NSG breached the SPA; and (3) under the SPA, NSG is obligated to indemnify Bagley Family Trust for its losses and damages.  (Doc. # 92).

In its amended intervenor complaint against Bagley Family Trust and MA, (doc. # 89), NSG seeks a declaration that it does not owe indemnification to Bagley Family Trust.  In count 2, NSG alleges a breach of contract claim against Bagley Family Trust asserting that the Trust breached implied obligations under the Stock Purchase Agreement.  According to NSG, Bagley Family Trust took actions that inured to the benefit of the Trust which resulted in a loss of $1,800,000 to NSG because MA failed to meet the specific performance goals that would have required an additional payment to NSG pursuant to the earn out provision of the SPA.  In count three, NSG alleges that Bagley Family Trust breached its implied duties of good faith and fair dealing by changing MA's business model specifically to avoid paying to NSG $1,800,000 contained in the earn out provision of the SPA.  NSG also accuses Bagley Family Trust of secretly recapitalizing MA to the detriment of NSG.  In count four, NSG accuses Bagley Family Trust, as majority shareholder, of breaching the fiduciary duty it owed to NSG as minority shareholder by changing MA's business's operating model and secretly recapitalizing the debt.  Count five is an unjust enrichment claim. In count six, NSG accuses Mobile Attic of misrepresentation.

The court has jurisdiction of the securities fraud claim brought pursuant to 15 U.S.C.

§ 78j(b).[8]  *See* 28 U.S.C. § 1331.  The court has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367(a).

Now pending before the court are Bagley Family Trust's motion for summary judgment.[9]  (Doc. # 164).  Bagley Family Trust seeks summary judgment on counts two, three and four of NSG's amended intervenor complaint.[10]  (*Id.*).  Bagley Family Trust does not seek summary judgment on count one which seeks a declaratory judgment that NSG does not owe indemnification to the Trust.  Bagley Family Trust also does not seek summary judgment on count six which alleges misrepresentations by Mobile Attic to NSG regarding "inaccuracies" in financial documents, specifically balance sheets and inventories.  (Doc. # 89 at 12).

Also pending before the court is NSG's motion for partial summary judgment (doc. # 166).  NSG does not seek summary judgment on any of the claims contained in Bagley Family Trust's amended counterclaim but rather seeks to define how the measure of damages

---

[8]  Mobile Attic's status as a closely-held corporation does not preclude the securities fraud claim. *See* 15 U.S.C. § 78j(b) ("It shall be unlawful for any person, ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange *or any security not so registered*, any manipulative or deceptive device. . . ." (emphasis added)).

[9]  There is no pending motion for summary judgment on any of the claims contained in the plaintiffs' amended complaint against defendants Peter Cash, Cash Brothers Leasing, and Bridgeville Trailers.  (Doc. # 91).  Consequently, it appears that the Bagley Family Trust and Mobile Attic are going to trial against these defendants.

[10]  The Bagley Family Trust and Mobile Attic also sought summary judgment on count five of the intervenor complaint which is a claim of unjust enrichment.  *See* Docs. # 164 & 165.  NSG conceded that the motions for summary judgment were due to be granted with respect to count five.  *See* Doc. # 173 at 3; Doc. # 186 at 3-4, 27.  Consequently, the court granted summary judgment on count five of the intervenor complaint, and dismissed this count.  *See* Doc. # 202.

is to be calculated in the event of an adverse judgment.[11]

The court has carefully reviewed the motions, responses, and evidentiary material submitted in support of and in opposition to the motions, and concludes that the Bagley Family Trust's motion for summary judgment as to NSG's amended intervenor complaint is due to be granted and NSG's partial motion for summary judgment is due to be denied.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute][12] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation omitted); FED.R.CIV.P. 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits

---

[11] NSG raises the following two couple of questions in its motion:

1.  What standing does Bagley Family Trust have as a fellow shareholder to sue NSG for anything other than a contractual claim for diminution of stock value based on the assignment of the SPA to the Trust?

2.  How should damages be measured for a breach of warranty under the SPA - the "before and after" test of whether the stock was worth less . . . due to a breach or by some other legal standard of measuring damages?

*See* Doc. # 166 at 7-8.

[12] Effective December 1, 2010, the language of Rule 56(a) was amended.  The word "dispute" replaced the word "issue" to "better reflect[] the focus of a summary-judgment determination." FED.R.CIV.P. 56(a), Advisory Committee Notes, 2010 Amendments.

8

show that there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law."). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by presenting evidence which would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324.

Once the movant meets his evidentiary burden and demonstrates the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; FED.R.CIV.P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine [dispute] for trial."). A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

9

To survive the movant's properly supported motion for summary judgment, a party is required to produce "sufficient [favorable] evidence" "that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990) *quoting Anderson*, *supra*. Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Hence, when a nonmoving party fails to set forth specific facts supported by appropriate evidence sufficient to establish the existence of an element essential to its case and on which the nonmovant will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law

10

applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co, Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).

However, if there is a conflict in the evidence, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S.

at 255; *Ruiz de Molina v. Merritt & Furman Ins. Agency*, 207 F.3d 1351, 1356 (11th Cir. 2000). With these principles of law in mind, the court will determine now whether summary judgment is appropriate and should be granted.

## III. DISCUSSION

### A. FACTS[13]

The Mobile Attic, Incorporated, was formed on September 12, 2001 by Peter Cash, Russell Cash, and National Security Group in Elba, Alabama. ( Doc. # 167, Ex. C; Doc. # 164, Ex. 3 at 43[14]). The company leased portable storage containers of differing sizes to its customers. Prior to forming MA, Cash contacted William Brunson, Jr. ("Brunson"), the President of NSG, an insurance holding company, to inquire about insurance, and at that time, indicated that he was also seeking "venture capital sources" to fund MA. (Doc. # 164, Ex. 3 at 44-45). As a result, NSG invested in MA and obtained 50 shares of common stock.[15] (*Id*. at 48; Doc. # 167, Ex. C at 3). Brunson was named to the Board of Directors of MA and

---

[13] At this stage of the proceedings, this court takes the facts alleged by the non-movant as true and construes them in the light most favorable to it. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) (citations omitted) ("In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party,' ... and 'resolve all reasonable doubts about the facts in favor of the non-movant.' ... Moreover, the court must avoid weighing conflicting evidence or making credibility determinations...."). In addition, NSG filed a "Statement of Disputed Facts" which contain a number of undisputed facts. *See* Doc. # 174 at 13-29. Thus, the facts set forth herein are drafted relying on the undisputed facts and construing the facts in the light most favorable to the non-moving party.

[14] All page references to the exhibits refer to the deposition or exhibit's page number, not the numbering created by the court's electronic filing system.

[15] Peter Cash and his brother Russell shared another 50 shares of common stock. (Doc. # 164, Ex. 3 at 48).

served as Chairman. (Doc. # 167, Ex. C). Peter Cash was elected President of MA. (*Id*.)

In the fall of 2006, Peter Cash and James Bagley ("Bagley") entered into negotiations for Bagley to purchase, on behalf of the Bagley Family Trust[16], a controlling interest in MA. On April 5, 2007, Bagley, on behalf of the Trust, entered into the SPA to purchase 61 shares of common stock in MA from Peter Cash, Russell Cash and NSG at a price of $60,000 per share for a total purchase price of $3,660,000.00. (Doc. # 164, Exs. 1 & 4). Peter and Russell Cash each sold 8 shares for $480,000 while NSG sold 45 shares for $2,700,000. The SPA defines the Purchaser as "James W. Bagley, an individual and Texas resident, and/or his assigns." (Doc. # 164, Ex. 1 at 1). In conjunction with the execution of the SPA, Bagley executed an assignment that conveyed his interest in the SPA to the Bagley Family Trust. (Doc. # 164, Ex. 2). The SPA also contained a Purchase Price Adjustment provision that provided for an adjustment to the selling price of the shares and payment to the selling shareholders of an additional "earn out" if certain financial goals were met.[17] (Doc. # 174 at 14, ¶ 14; Doc. # 164, Ex. 1).

> 1.3   <u>Purchase Price Adjustment:</u>  The Purchase Price represents a value of Sixty Thousand Dollars ($60,000) per Share.  If during any period of six consecutive months ("Six Month Period") prior to the expiration of twenty-four (24) months after the Closing Date either the (1) Operating Profit of the Corporation averages One Hundred Twenty-Five

---

[16] While the parties dispute the effect of the assignment on the Trust's rights to recover in this action, there is no dispute that the parties all knew that Bagley was executing the SPA on behalf of the Trust and that the Trust would be the majority shareholder in MA.

[17] The parties refer to this provision as the "earn out" provision. For the sake of simplicity and clarity, the court will utilize this term rather than the term "Purchase Price Adjustment" contained in the SPA.

Thousand Dollars ($125,000) each month or (b) Gross Revenue of the Corporation reaches a total of Three Million Seven Hundred Fifty Thousand Dollars ($3,750,000) (the "Adjustment Trigger"), the Purchase Price shall be adjusted by an increase of Forty Thousand Dollars ($40,000) per share and (a) Seller NSG shall be paid an additional One Million Eight Hundred Thousand Dollars ($1,800,000), Seller PLC shall be paid an additional Three Hundred Twenty Thousand Dollars ($320,000) and Seller RLC shall be paid an additional Three Hundred Twenty Thousand Dollars ($320,000). The Purchase Price Adjustment, if any, shall be due and payable in cash within forty-five (45) days after the last day of the Six Month Period. For purposes of this provision, the terms "Operating Profit" and "Gross Revenue" shall mean the pre-tax profit and the gross revenue of the Corporation.

(Doc. # 164, Ex. 1 at 3).

The parties negotiated the terms of the earn out provision. (Doc. # 174 at 15, ¶ 6). It is undisputed that MA did not achieve either benchmark sufficient to trigger the earn out provision.[18] Consequently, none of the shareholders, including NSG, received any additional payment for their shares in accordance with the earn out provision.

In addition to the earn out provision, the SPA required Bagley Family Trust to obtain the release of NSG from its guaranty obligation of MA's debt to First Commercial Bank. (Doc. # 174 at 21, ¶ 14).

1.5   Release of Guarantee: Condition Precedent. The parties acknowledge and agree that the Corporation is currently indebted to First Commercial Bank in Birmingham, Alabama for approximately $9,400,000 (the "Debt"), and that the Seller NSG has executed one or more continuing guarantees whereby Seller NSG has unconditionally

---

[18]   While the parties agree that there were two different trigger points, they disagree on who came up with the idea of the second trigger point. Determining the origin of the idea of the second trigger point is immaterial to the resolution of the pending motions for summary judgment.

> guaranteed the repayment of said Debt (the "Guarantee").  Purchaser
> hereby agrees that Purchaser shall use its best efforts to cause the
> Guarantee of Seller NSG to be absolutely and unconditionally released,
> such that Seller NSG is no longer individually obligated for the Debt.
> Purchaser acknowledges that causing such release may require
> Purchaser to execute in favor of the aforesaid bank a guarantee of the
> Debt, or paying down or all or (sic) a portion of the Debt.  The parties
> further agree that the release of the Guarantee contemplated hereunder
> shall be a condition precedent to Seller NSG's obligation to transfer any
> shares hereunder.

(Doc. # 164, Ex. 1 at ¶ 1.5).

Brunson testified that NSG was not willing to sell its shares to Bagley Family Trust without a release from the debt guarantee.  (Doc. # 174 at 21, ¶ 15; Doc. # 164, Ex. 8 at 199-200).  However, Brunson did not know how Bagley Family Trust was going to secure NSG's release from the debt guaranty.  (Doc. # 164, Ex. 8 at 200).  Moreover, it is undisputed that the SPA did not specify the manner in which Bagley Family Trust was to obtain the release of NSG from the debt guarantee.

On April 6, 2007, the day after the SPA was executed, the MA Board of Directors met.  At that meeting, Josh Wilson ("Wilson"), a certified public accountant employed by MA, was named Secretary/Treasurer of MA, and Bagley's son-in-law Wax was given the operating title of President.  (Doc. # 164, Ex. 82 & 54 to Ex. 9).  During this meeting, it was discussed that Bagley would pay off the debt guaranteed by NSG, lend money to MA and infuse $4,000,000 into the company as equity.[19]  (Id.)  During the meeting, Cash made a

---

[19]  Bagley and Cash discussed this distribution of funds.  (Doc. # 164, Ex. 9 at 739).  There is no evidence that NSG was aware of this plan.

motion that Bagley Family Trust be issued preferred shares with a bond equivalency. (Doc. # 164, Ex. 9 at 821-23). The motion was approved and Bagley Family Trust was issued the preferred stock. (*Id*. at 822). Interest on the preferred stock was to be paid quarterly. (*Id.* at 823).

On April 16, 2007, Bagley authorized wire transfers in the amounts of $5,000,000, $4,500,000, and $50,000. These funds were used to release NSG from the debt guarantee as required by the SPA. (Doc. # 164, Ex. 19 to Ex. 6). On May 10, 2007, Community Bank and Trust confirmed that MA "has fully satisfied the outstanding balance of their loan with CB&T. Additionally, Russ Cash, Peter Cash, and National Security Group have been released from their liability as guarantors for the indebtedness of Mobile Attic, Inc." (Doc. # 164. Ex. 10).

Because of the manner in which Bagley accessed the funds, it was not possible to place the funds into MA as equity.[20] Nonetheless, the funds were initially entered into MA's accounting program as "paid in capital."[21] (Doc. # 164, Ex. 9 at 763-64).

When the Trust became the majority shareholder, Bagley and Wax pursued a business strategy that focused on opening corporate owned locations instead of franchise

---

[20] Although NSG complains that Bagley and MA "secretly recapitalized" the company to the benefit of Bagley Family Trust, there is no dispute that Bagley Family Trust paid $9,500,000 to secure NSG's release from the debt guarantee. It is further undisputed that one source of the funding came from an IRA which restricted how Bagley could invest the money. (Doc. # 164, Ex. 9 at 738; Ex. 14 at 82; Ex. 13). It is not clear, however, when Bagley discovered that the funds could not be invested as equity in MA.

[21] The record is not clear as to who entered the funds into MA's books as "paid in capital" or when this entry was made.

opportunities. (Doc. # 164, Ex. 6 at 203). This focus on corporate growth required MA to expend additional amounts of capital.[22]

In May, 2008, for reasons he was unable to remember,[23] Wilson sent Bagley a Promissory Note and Security Agreement to document that the April 2007 $9,500,000 payment was a loan to MA. (Doc. # 164, Ex. 30 to Ex. 6; Ex. 9 at 736-39). Bagley executed the promissory note and security agreement on August 19, 2008. (Doc. # 164, Ex. 12 at 128-30, Ex. 60 attached). It is undisputed that no documents existed at the time of the $9,50,000 payment in April 2007 to demonstrate that the payment was actually a loan to MA. Further, it is undisputed that the loan document and security agreement were created a year after the payment was made and that the documents were back-dated with the wrong date.[24]

During the period of time when Bagley was negotiating the SPA, Peter Cash was also busy. In fact, beginning in October 2005 and continuing until July 2008, Cash engaged in a "check kiting" scheme to defraud two banks, and he engaged in fraudulent activities to obtain loans. *See United States v. Cash*, Crim. No. 1:10cr185-WKW (M.D. Ala.) (Doc. # 1, Information; Doc. # 8, Plea Agreement). As a result of Cash's illegal activities, Trinity Bank suffered a loss of $1,244,118.06, and Citizen's Bank suffered a loss of $7,534,632.61. (*Id.*

---

[22] It is undisputed that the SPA contains no representations or warranties by Bagley Family Trust regarding the operation of MA after closing on the SPA.

[23] In his deposition, Wilson testified that he didn't "really remember" what prompted him to send Bagley the promissory note and security agreement. (Doc. # 164, Ex. 9 at 739).

[24] The note and security agreement indicate that the closing of the SPA was on March 28, 2007 when the SPA was executed on April 5, 2007.

at Doc. # 20, Judgment).

At some point, it became known that Cash's actions extended into the operations of MA.[25]  For example, 548 mobile storage containers which appeared on MA's financial books, did not exist.  In addition, the financial statements reflected accounts receivable in the amount of $1,802,198 which were overstated by $1,209,000.  (Doc. # 167, Ex. H).

Relying on the indemnification provision[26] in the SPA, on February 18, 2009, Bagley, on behalf of the Trust, wrote to Brunson seeking from NSG repayment of losses suffered by the Trust as a result of Cash's fraudulent activity.[27]  NSG denied responsibility for the Trust's

---

[25]  The record does not indicate how or when the parties discovered Cash's activities or the impact of those activities on MA.

[26]  Section 6.3 of the SPA provides as follows:

> 6.3.   Remedy for Breach:  Indemnification.  Sellers shall, jointly and severally, indemnify, defend and hold Purchaser and Purchaser's permitted successors and assigns (each a "Purchaser Indemnified Party" or, collectively, "Purchaser Indemnified Parties") harmless from and against all losses, damages, liabilities or expenses (including reasonable attorneys' fees and expenses) ("Loss" or "Losses") suffered by a Purchaser Indemnified Party that result or arise from:
>
> 6.3.1.  any breach of a representation and warranty made by any of the Seller in this Agreement.
>
> 6.3.2.  any breach or default in the performance of any covenant or agreement made by any of the Sellers under (i) this Agreement or (ii) any of the agreements to be executed and delivered pursuant to this Agreement.
>
> 6.3.3.  any fraud, fraud in the inducement or misrepresentation by any of the Sellers as regards (i) this Agreement or (ii) any of the agreements to be executed and delivered pursuant to this Agreement.

(Doc. # 164, Ex. 1 at 18).

[27]  On October 25, 2010, Cash pleaded guilty to bank fraud.  On January 26, 2011, Cash was sentenced to 58 months of incarceration, and ordered to pay $8,778,750.67 in restitution to Trinity Bank and
(continued...)

alleged losses, (Doc. # 167, Ex. I), and this lawsuit followed.

## B. BAGLEY FAMILY TRUST'S MOTION FOR SUMMARY JUDGMENT

Bagley Family Trust moves for summary judgment on counts two, three and four of National Security Group's amended intervenor complaint. (Doc. # 164). The Trust does not seek summary judgment on count one of the complaint which seeks a declaratory judgment that NSG does not owe indemnification to the Trust. (Doc. # 89 at 8-9). Bagley Family Trust also does not seek summary judgment on count six which alleges misrepresentations by Mobile Attic to NSG regarding "inaccuracies" in balance sheets and inventories. (*Id*., at 12). Thus, the court turns to the counts upon which Bagley Family Trust seeks summary judgment.

Count two of the amended intervenor complaint alleges a breach of contract claim related to the earn out provision of the SPA. Specifically, NSG alleged that

> Bagley breached the implied obligations of the Stock Purchase Agreement by diverting manpower and working capital from Mobile Attic's core revenue-producing operations (including container sales, rentals and franchises), to fund the opening and operation of new company-owned locations. As a result of such actions, Bagley was able to allocate money to Mobile Attic that otherwise would have been owed to NSG.

(*Id*., at 10, ¶ 34). NSG claims damages in the amount of $1,800,000 owed under the earn out provision.

In count three, NSG alleges that Bagley breached an implied duty of good faith and

---

[27](...continued)
Citizens Bank. *See United States v. Cash*, Crim. No. 1:10cr185-WKW (M.D. Ala.) (Doc. # 20, Judgment).

fair dealing "by changing the business model of Mobile Attic to ensure that the performance targets were not met.  Bagley further breached this duty by secretly recapitalizing the company without notice to NSG . . ." (*Id.*, at 10-11, ¶ 38).  NSG again seeks damages in the amount of $1,800,000 owed under the earn out provision.

Finally, in count four, NSG alleges that Bagley Family Trust, as a majority shareholder, owed a fiduciary duty to NSG as a minority shareholder, and that the Trust breached that duty.

> 42.   Bagley breached his fiduciary duty to NSG by, among other things, secretly recapitalizing the company without notice to NSG, and failing to provide NSG with monthly financial statements so that it could monitor whether Mobile Attic was on track to meet the performance targets, and notice of management actions which were contrary to its interest as a shareholder.  Upon information and belief, Bagley has made other decisions and taken other actions affecting the viability of the company, and thus the ownership interests of minority shareholders, without notice to them and without any meeting of shareholders. Bagley has treated Mobile Attic as, in essence, its own alter ego and/or instrumentality.

(*Id.*, at 11, ¶ 42).  As damages, NSG claims the amount of $1,800,000 and any "other damages (yet to be ascertained)."  (*Id.* at ¶ 43).

Because the allegations contained in count two and three of the amended intervenor complaint coalesce, the court deems it prudent to examine these counts jointly.

> **1.    Count Two, Breach of Contract, and Count 3, Breach of Implied Duty of Good Faith and Fair Dealing**.  In count two, NSG alleges that Bagley acted in a manner to cause MA to fail to meet performance targets which in turn led to NSG's loss of the

additional $1,800,000 payment contained in the earn out provision of the SPA. In count three, NSG alleges that Bagley Family Trust and MA changed the business model of MA which harmed NSG as a minority stockholder. NSG points to the "secret recapitalization" of the $9,500,000 debt as evidence that Bagley Family Trust breached the duty of good faith and fair dealing. Bagley Family Trust seeks summary judgment on these claims on the basis that there are no implied covenant or duties in the SPA, and even if there was an implied duty of good faith and fair dealing, there was no breach of that duty. According to Bagley Family Trust, no duty is owed to NSG because the sale of the shares was negotiated at arms' length.

NSG asserts that the earn out provision in the SPA "gave rise to an accompanying good faith obligation by Bagley Family Trust to 'make reasonable efforts' to manage the company to achieve those targets." (Doc. # 173, Br. in Opp. at p.3). Bagley Family Trust alleges that it is entitled to summary judgment on this breach of contract claim because NSG cannot establish, as a matter of law, that there are any implied obligations under the Stock Purchase Agreement that would prohibit Bagley Family Trust and MA from pursuing a new growth strategy for MA. *See* Doc. # 164 at 20.

1.     **Breach of Contract**. Bagley Family Trust argues that Texas law applies to this claim because NSG is complaining about a breach of a specific provision in the SPA. NSG counters that "[a]ll issues of Mobile Attic's corporate governance, and the duty relationship to its shareholders to one another, are governed by Alabama law." (Doc. # 173 at 6). Under either theory and corresponding state law, Bagley Family Trust's motion for summary

21

judgment is due to be granted.

               **a. Construing the claims as breach of contract under Texas law**.  Bagley

Family Trust argues that, under Texas law, no implied covenant or implied duty of good faith

and fair dealing exists in the SPA, and thus, it is entitled to judgment as a matter of law.  In

its amended intervenor complaint, NSG very clearly frames the claim in count two as breach

of contract.  *See* Doc. # 89 at 9.  NSG argues that Bagley breached the SPA by failing to

fulfill its implied obligations under the agreement to "exert reasonable efforts to achieve the

performance targets, and would continue to operate Mobile Attic in a manner designed to do

so." (*Id*. at 9, ¶ 33).  According to NSG, the breach of the earn out provision occurred

because Bagley "divert[ed] manpower and working capital from Mobile Attic's core

revenue-producing operations (including container sales, rentals and franchises) to fund the

opening and operation of new company-owned locations."  (*Id*. at 10, ¶ 34).

     It is the earn out provision in the SPA, not the actions themselves, that forms the basis

of NSG's claim that the Trust breached the SPA.  Because NSG contends that Bagley and

MA breached the earn out provision of the SPA by failing to exert reasonable efforts to

achieve the performance targets and failed to operate MA in a reasonable manner, the court

construes NSG's claim in count two of the amended intervenor claim as a breach of contract

claim specific to the SPA.

     Construing the claim as a breach of contract claim then implicates the choice of law

provision in the SPA.  The SPA provides that the "[a]greement shall be construed and

enforced under and in accordance with and governed by the law of the State of Texas." (Doc. # 164, Ex. 1 at 21, ¶ 8.6).  Consequently, to the extent that NSG presents a breach of contract claim in count two, Texas law applies to that claim.[28]

To establish a breach of contract claim under Texas law, NSG must establish the following elements:

> (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Southwell v. University of Incarnate Word,* 974 S.W.2d 351, 354–55 (Tex. App. 1998).

*Texas Dept. of Transp. v. Crockett*, 257 S.W.3d 412, 416 (Tex. App., 2008).[29]  There is  no dispute that the SPA constitutes a valid contract and that NSG performed under the contract. It is on the third element, a breach, that NSG's claim fails as a matter of law.

In the case of a contingency contract, there can be no liability under the contract until the contingency happens.  Unless MA made a profit or increased revenue in accordance with the terms set forth in the earn out provision, the selling shareholders, including NSG, were not entitled to an adjustment of the sale price of their shares.  Because the earn out provision

---

[28]  Moreover, under Texas law, because NSG described its claim as a breach of contract claim, NSG is bound by its pleadings.  "Allegations contained in the pleadings define the nature and character of a suit." *Edlund v. Bounds*, 842 S.W.2d 719, 726 (Tex. App. 1992).  *See also Erisman v. Thompson*, 140 Tex. 361, 366-67, 167 S.W.2d 731, 733 (Tex. 1943) ("the plaintiff defined the cause of action this defendant was called upon to meet, . . . Plaintiff was bound by her pleadings."); *Safety Cas. Co. v. Wright*, 138 Tex. 492, 504, 160 S.W.2d 238, 245 (Tex. 1942) ("A plaintiff can recover, if at all, only on the cause of action pleaded by him.").

[29]  The elements of a breach of contract claim are the same under Alabama law.  *See Southern Med. Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995) (setting out the elements of a breach of contract claim).

was a contingency clause, and it is undisputed that the contingency did not occur, regardless of the reason for the non-occurrence, Bagley Family Trust cannot be said to have breached the Agreement.

> The parties to a contract may agree that it shall not become effective or binding until or unless some specified condition is performed or occurs, in which case there is no binding contract until such condition has been complied with. 10 TEX.JUR., p. 52, § 29, and authorities there cited. Such a stipulation is called a 'condition precedent' 10 TEX.JUR. p. 343, § 197, and authorities there cited. When a promise is subject to a condition precedent, there is no liability or obligation on the promissor and there can be no breach of the contract by him until and unless such condition or contingency is performed or occurs. 10 TEX.JUR., p. 396, § 225, and authorities cited; *Ferguson v. Mansfield*, 114 Tex. 112, 263 S.W. 894, 900, par. 4; *First Methodist Episcopal Church v. Soden*, 131 Wash. 228, 229 P. 534, 536, par. 3.

*Shaper v. Gilkison,* 217 S.W.2d 878, 880 (Tex. Civ. App. 1949).

In response to Bagley Family Trust's motion for summary judgment, NSG argues that there are genuine disputes of material facts that preclude summary judgment on this claim. NSG contends that Bagley Trust "diverted MA from a number of its traditional business practices, practices which had generated the profit and revenues upon which the assumptions used for the "earn-out" triggers set forth in Section 1.3 were based." (Doc. # 173 at 8). According to NSG, changing MA's business strategy from franchises to corporate locations, and the 'secret recapitalization' of the $9,500,000 debt, were done specifically to prevent MA from making a profit in order to avoid paying NSG the $1,800,000 it would have been entitled to under the earn out provision. NSG further argues that there are genuine disputes of material fact regarding Bagley Family Trust's actions regarding the $9,500,000 payment

24

of the debt guarantee.  NSG points to evidence that a loan agreement and security agreement were created without its knowledge, that the documents were back-dated to a date unconnected to the execution of the SPA or payment of the debt guarantee, and that Bagley Family Trust was issued preferred stock that entitled it to interest before the other shareholders as evidence that the Trust and MA acted in its own best interest and to the detriment of NSG.

Bagley Family Trust counters that there was no implied duty because NSG was aware that the Trust was planning on shifting MA's business model towards a corporate location based business instead of focusing on franchises, and points to the testimony of Brunson as the President of NSG.  Brunson testified in deposition that he understood that MA would continue to grow and expand after the execution of the SPA but he did not recall any specific plans on how MA would expand.  (Doc. # 164, Ex. 5 at 89).  He further testified that he anticipated that Bagley Family Trust would grow MA's business by adding new locations. (Doc. # 164, Ex. 5 at 228).

The problem NSG faces is that, regardless of the plans to alter MA's business strategy or the recapitalization of the debt, it is undisputed that the SPA does not specify how MA is to reach the revenue or profit goals set forth in the earn out provision.  It is also undisputed that nothing in the SPA limits the management of MA, prohibits MA from pursuing any business strategy, or otherwise specifies how MA is to be operated.  The earn out provision is quite clear.  The purchase price of the shares will be adjusted *only if* certain financial goals

25

were met, and it is undisputed that those goals were not met.  Consequently, as a matter of law, NSG cannot demonstrate a breach of that provision.

Construing count three of the complaint as a breach of the implied duty of good faith and fair dealing implicit in the contract also renders Texas law applicable to this claim.[30] Count three of the complaint is substantially a restatement of count two, sounding in tort rather than contract.  For the same reasons that the condition precedent contained in the agreement were not met, there was no breach of any duty, implied or otherwise. Consequently, Bagley Family Trust is entitled to summary judgment on this count as well.

**b.  Construing the claims under Alabama law**.  Even if the court were to conclude NSG's construction of its claim is correct that Alabama law applies, Bagley Family Trust is still entitled to summary judgment on NSG's claims.  NSG argues that Alabama law applies because its claims are based on solely on actions taken after the SPA was executed.[31] According to NSG, the breach of the SPA occurred when actions were taken to cause MA to fail to reach the performance targets sufficient to trigger the earn out provision.  NSG's claims stem from the failure of MA to reach certain performance targets which would then trigger the earn out provision causing an adjustment of the purchase price NSG received for

---

[30] Part of the difficulty in this case is the parties' conflation of the issues.  Repeatedly, the parties have used language that suggest contract claims and then describe allegations that sound in tort.

[31] Alabama applies the "internal affairs doctrine" when determining choice-of-law.  *See Ex parte Bentley*, 50 So. 3d 1063, 1071 (Ala. 2010).  The "internal affairs doctrine" relies on the laws of the state of incorporation to govern claims involving the internal corporate relationship.  *Id.  See also, Massey v. Disc Manufacturing, Inc.,* 601 S. 2d 449, 454 (Ala. 1992); *Scrushy v. Tucker*, 70 So. 3d 289, 298 (Ala. 2011).  "In Alabama, the law of the state of incorporation governs the internal corporate relationship."  *Bentley*, 50 So. 3d at 1070.  MA was incorporated in Alabama.

its shares.   In essence, NSG accuses Bagley Family Trust of wasting MA's assets, mismanaging MA and engaging in self-dealing to the benefit of the Trust and the detriment of NSG.  This  claim is clearly a derivative claim which NSG lacks standing to bring.

> [A]n allegation of waste of corporate assets does not permit a minority shareholder to recover on his own behalf; rather such wrongdoing gives rise only to a derivative claim, which must be brought on behalf of the corporation."

*Brooks v. Hill*, 717 So. 2d 759, 762 (Ala. 1998).

NSG argues that its claims against Bagley Family Trust are specific to NSG and do not affect the other shareholders, and thus are not derivative.  "[I]if the stockholder alleges that the wrongs have been committed by the corporation as a direct fraud upon him, and that such wrongs do not affect other stockholders, that one stockholder may maintain a direct action in his individual name."  *McDonald v. U.S. Die Casting and Development Co.*, 541 So. 2d 1064, 1068-69 (Ala. 1989).  NSG is simply wrong.  The SPA clearly provides that the other two shareholders, Peter Cash and Russell Cash, are also entitled to additional monies under the earn out provision, provided MA achieves certain performance targets.

> [T]he actual harm . . . was caused by the alleged mismanagement of wrongdoing of the [Trust's] officers and directors.  This harm is not unique to [NSG]; rather it is suffered equally by all remaining eligible shareholders in [MA].  Because the harm suffered by [NSG] also affects the other remaining eligible shareholders in [MA], [NSG] do[es] not have standing to assert a direct claim.

*Altrust Fin. Servs., Inc. v. Adams*, 76 So. 3d 228, 246 (Ala. 2011).  Thus, because the claims that NSG bring against Bagley Family Trust and MA regarding the earn out provision also

affect the other shareholders, NSG lacks standing to maintain this claim as a direct action in its name only.

NSG complains about the manner in which Bagley Family Trust operated MA, and about the business strategy pursued by Bagley Family Trust to increase corporate growth of MA. It complains about the manner in which the Trust released NSG from its debt guarantee and about how the Trust financed the debt through the issuance of preferred stock. "If the wrong directly damages the corporation and its assets from waste, conversion and intentional mismanagement, the claim is the corporation's." *Altrust*, 76 So. 3d at 241 citing *Hardy v. Hardy*, 507 So. 2d 409 (Ala. 1987) and *Shelton v. Thompson*, 544 So. 2d 845 (Ala. 1989). NSG's claim that Bagley Family Trust mismanaged Mobile Attic and engaged in self-dealing is "a quintessential derivative injury, merely incidental to [its] status as stockholder." *Altrust*, 76 So. 3d at 244. In asserting that the Bagley Family Trust breached its duty as majority shareholder to the minority shareholders by the manner in which it ran the company, NSG's claims are clearly "incidental to its status as a shareholder," and thus, derivative. *Id*. at 246. The court concludes therefore that NSG's claims are derivative, and it lacks standing to bring a direct action on its behalf.

**2.      Count 4 - Breach of Fiduciary Duty**. NSG alleges that Bagley Family Trust, as a  majority stockholder owes a fiduciary duty to it, as minority stockholder, and that Bagley Family Trust breached that duty by secretly recapitalizing the $9,500,000 payment of the debt guarantee. In essence, in this count, NSG complains about the manner in which

Bagley Family Trust secured NSG's release from its loan guarantee.[32]  Bagley Family Trust seeks summary judgment on this claim because it asserts that, under Alabama law, it is a derivative claim that NSG as a shareholder lacks standing to bring as a direct action.  It is undisputed that Alabama law applies to this claim.[33]  The court concludes that this claim is a derivative claim for the same reasons that counts two and three are derivative under Alabama law.  Consequently, the court concludes that NSG lacks standing to bring this claim as a direct action on its behalf.

In response to the argument that this claim is a derivative claim, NSG argues that this claim is an oppression or squeeze out claim against Bagley Family Trust and MA.  In its supplemental brief on the issue of derivative actions, NSG contends that its claims against Bagley Family Trust are "either contractual in origin or which result from shareholder oppression by Bagley Trust."  (Doc. # 188 at 13).  The court disagrees.  To establish the tort of oppression, NSG must demonstrate, not only that the Bagley Family Trust took control of MA, but also that the Trust, "acting through the board and corporate officers, which they control, deprive[d] [NSG] of [its] just share of corporate gains."  *Burt v. Burt Boiler Works, Inc.*, 360 So. 2d 327, 332 (Ala. 1978).  *See also Galbreath v. Scott*, 433 So. 2d 454, 457 (Ala. 1983); *Brooks*, 717 So. 2d at 764-65.

The amended intervenor complaint does not, and cannot be read to, raise an

---

[32] NSG also complains that Bagley Trust failed to provide it with monthly financial statements.

[33] *See* Fn 28, *supra.*

29

oppression or squeeze out claim.  In court four, NSG alleges that

> Bagley breached his fiduciary duty to NSG by, among other things, secretly recapitalizing the company without notice to NSG, and failing to provide NSG with monthly financial statements so that it could monitor whether Mobile Attic was on track to meet the performance targets, and notice of management actions which were contrary to its interest as a shareholder.  Upon information and belief, Bagley has made other decisions and taken other actions affecting the viability of the company, and thus the ownership interests of minority shareholders, without notice to them and without any meeting of shareholders. Bagley has treated Mobile Attic as, in essence, its own alter ego and/or instrumentality.

(Doc. # 89 at 11 ¶ 42).

NSG seeks in damages the amount owed as the adjusted purchase price of the shares of $1,800,000.  NSG does not seek "its just share of corporate gains," but rather the adjusted purchase price contained in the earn out provision.  *See Burt*, *supra*.  The damages that NSG seeks is indicative of its claim.  It doesn't seek lost corporate profits because it has not alleged a squeeze out claim.  *See Michaud v. Morris*, 603 So. 2d 886, 889 (Ala. 1992) ("there were no corporate earnings, so the majority did not unfairly deprive [the minority] of his pro rata share in corporate earnings by oppressively managing the affairs of the corporation.")

NSG's claim for damages, coupled with the language of the claim itself, make clear that NSG did not allege an oppression or squeeze out claim.  "Even a generous reading of [NSG's] amended complaint in light of liberal pleading rules reveals that the complaint nowhere states an [oppression or squeeze out] claim.  The complaint never so much as mentions the words ["oppression" or "squeeze out"]" *Thompkins v. Lil' Joe Records*, 476 F.3d 1294, 1310 (11th Cir. 2007).  NSG "may not amend [its] complaint through argument

in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.,* 382 F.3d

1312, 1315 (11th Cir. 2004). Finally, framing the issue as an oppression or squeeze out claim

does not change the nature of the claim.

> "Although this Court has held that majority shareholders in a close corporation 'owe a duty to at least act fairly to minority interest,' *Burt Boiler Works*, 360 S. 2d [327] at 331 [(Ala. 1978)], the squeeze-out cause of action is not a panacea for any and all conduct taken by majority shareholders of a close corporation that could be deemed 'unfair' to a minority. As our holding in *Galbreath* [*v. Scott*, 433 S. 2d 254 (Ala. 1983)] indicates, a minority shareholder cannot parley a wrong committed primarily against the corporation, which gives rise to a derivative claim only, into a personal recovery of damages under a squeeze-out theory by simply stating that the injury to the corporation is also 'unfair' to him as well.

*Altrust*, 76 So. 3d at 244. Consequently, the court concludes that NSG has not alleged, and

may not now, raise an oppression or squeeze out claim against Bagley Family Trust.[34]

Finally, and perhaps most importantly, although NSG complains about the manner in

which the Bagley Family Trust retired its debt guarantee, the SPA required the Trust to

remove NSG as the guarantor of MA's debt, and specifically contemplated the possibility

that the Trust might be required to pay the balance of the loan. Section 1.5 of the SPA state

as follows.

> 1.5 <u>Release of Guarantee: Condition Precedent</u>: The parties acknowledge and agree that the Corporation is currently indebted to First Commercial Bank in Birmingham, Alabama for approximately $9,400,000 (the "Debt"), and that the Seller NSG has executed one or more continuing guarantees whereby Seller NSG has unconditionally guaranteed the repayment of said Debt (the

---

[34] The appropriate vehicle for raising this claim would have been to seek to amend the intervenor complaint. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). NSG has not sought to do so, and at this late date, a motion to amend is untimely.

"Guarantee"). Purchaser hereby agrees that Purchaser shall use its best efforts to cause the Guarantee of Seller NSG to be absolutely and unconditionally released, such that Seller NSG is no longer individually obligated for the Debt. Purchaser acknowledges that causing such release may require Purchaser to execute in favor of the aforementioned bank a guarantee of the Debt, or *paying down or (sic) all or a portion of the Debt*."

(Doc. # 164, Ex. 1 at 4, ¶ 1.5) (emphasis added). The SPA does not limit the manner in which Bagley Family Trust was to release NSG from its debt guarantee, and plainly contemplates that the Trust could pay off the entire debt if necessary. NSG got exactly what it bargained for, and what the SPA called for – its release from its debt guarantee. The court can think of no better way to release NSG from its guarantee than by completely paying off the debt, as Bagley Family Trust did. When Bagley Family Trust paid the debt to remove NSG from its guarantee, the Trust satisfied the condition precedent required by the SPA.

NSG further contends that Bagley Family Trust breached its fiduciary duty by taking other actions including issuing preferred stock that benefitted the Trust. MA's Board of Directors voted to give the Trust preferred stock, and the SPA allowed for the distribution of preferred stock. *See* Doc. # 164, Ex. 1 at 19, ¶ 7.1.1 & 7.1.2. Moreover, it is clear that prior to the execution of the SPA, NSG and Cash were aware that the SPA permitted the Bagley Family Trust to be issued preferred shares at will. (Doc. # 164, Ex 11). In an email to Josh Wilson and Peter Cash, Mobile Attic's attorney Paul Turner reviewed the proposed Shareholders's Agreement and expressed the following concern.

> Article I - in general, and this harkens back to my review of the agreement, note that the Trust has the ability to issue preferred shares pretty much carte blanche, with the preferences for such shares to be at the Trust's

discretion.  For example, he could convert his common shares into preferred shares that receive the first 10.0m in distributions each year.  An extreme example, but just wanted to point this out.

(Doc. # 164, Ex. 11).  Cash forwarded this email to Brunson and Brunson forwarded the email to another NSG employee, Brian Mcleod.  (*Id*.)

In essence, NSG argues that the Bagley Family Trust should have found a different way to release NSG from its debt guarantee.  However, the SPA specifically permits the Trust to pay off the debt completely in order to remove NSG from the guarantee.  The SPA required the Trust to refinance the debt which it did, and the SPA permitted MA to issue Bagley Family Trust preferred shares "in exchange for [the Trust] investing additional capital in the Corporation."  (Doc. # 164, Ex. 1 at 19, ¶ 7.1.2).  The court concludes that no reasonable jury could conclude that the Bagley Family Trust breached its fiduciary duty to NSG by fulfilling its explicit duty under the SPA in a manner contemplated by and in accordance with the SPA.  Consequently, the plaintiffs are entitled to summary judgment on count four of NSG's amended intervenor complaint.

Accordingly, for the reasons as stated, the court concludes that Bagley Family Trust's motion for summary judgment on counts two, three and four of the amended intervenor complaint is due to GRANTED.

### C.  NSG'S MOTION FOR SUMMARY JUDGMENT

In count one of its amended counterclaim, Bagley Family Trust alleges that NSG falsely represented and warranted MA's financial statements to induce Bagley to (1) enter

33

into the SPA and (2) release NSG from its guarantees on the loans of MA.  In count two,

Bagley Family Trust alleges that NSG breached the SPA.  Finally, in count three, Bagley

Family Trust seeks indemnification from NSG for all damages and losses that resulted from

the false representations and warranties.  *See* Doc. # 92.

NSG does not seek summary judgment on any particular count of Bagley Family

Trust' amended counterclaim (doc. # 92) but rather

> asserts two questions of law:  First, what standing does Bagley Trust have, as
> a fellow MA shareholder, to sue NSG for anything other than a contractual
> claim for diminution of stock value based on the assignment of the SPA to the
> Trust?  Second, how should damages be measured for a breach of warranty
> under the SPA – whether by the "before and after" test of whether the stock
> was worth less (using Bagley's same pricing formula) due to a breach, or by
> some other legal standard of measuring damages?

(Doc. # 166 at 7-8)

According to NSG, answering these questions in a motion for summary judgment will

"narrow the issues for trial."[35]  (*Id.*, at 2).  NSG seeks to "define the limits and parameters

of Bagley [Family] Trust's standing (if any) to sue under the SPA for all of the claims and

damages alleged against NSG in its Amended Counterclaim."  (*Id.* at 14, ¶ 16).  The court

now turns to each question presented by NSG.

Relying on the Assignment of Stock Purchase Agreement signed by James Bagley in

conjunction with the signing of the SPA, NSG first argues that the rights of the Bagley

Family Trust arise "only by virtue of [the] assignment," and therefore, the Trust can only

---

[35] NSG also moves summary judgment on count one of its' amended intervenor complaint, seeking
a declaration that it does not owe indemnification to the Bagley Family Trust.  *See* Doc. # 166.

bring contractual claims based on the SPA, and does not have standing to bring any personal

tort claims.  According to NSG, under Alabama law, misrepresentation claims are personal

in nature and cannot be assigned.  NSG relies on *Rice v. Birmingham Coal & Coke Co., Inc.*,

608 So. 2d 713 (Ala. 1992) for the proposition that personal rights are not assignable.

> Moreover, it has long been the law in Alabama that a chose in action for recovery of converted property is not assignable. In *Goodwyn,* 8 Port. at 240, this Court said, "That a chose in action is not at common law assignable, or, in other words, that the right to sue for and recover the possession, cannot be transferred to another, is an ancient doctrine of the common law- (Coke's Litt. 214, A.; 2 Black. Com. 397)."  Similarly, this Court held that when one knows that his property has been taken by another with a claim to title, his title is changed into a chose in action, which cannot be transferred or conveyed to another. *Dunklin v. Wilkins,* 5 Ala. 199 (1843); *Foster v. Goree,* 5 Ala. 424 (1843); *Brown v. Lipscomb,* 9 Port. 472 (Ala.1839)." Similarly, this Court held that when one knows that his property has been taken by another with a claim to title, his title is changed into a chose in action, which cannot be transferred or conveyed to another. *Dunklin v. Wilkins,* 5 Ala. 199 (1843); *Foster v. Goree,* 5 Ala. 424 (1843); *Brown v. Lipscomb,* 9 Port. 472 (Ala.1839).

*Rice*, 608 So. 2d at 715.

This appears to be a correct proposition of the law in Alabama.  *See Miller v. Jackson*

*Hosp. & Clinic*, 776 So. 2d 122, 125 (Ala.  2000); *Lowe v.  Fulford*, 442 So. 2d 29, 32 (Ala.

1983) ("'It is . . .  well settled that, in the absence of statutory provision, rights of action for

torts purely personal do not survive, and are not assignable.'").

However, this argument avails NSG nothing.  Bagley Family Trust has rights under

the SPA separate from the Assignment.  Under the SPA, NSG, as one of the Sellers, agreed

to, jointly and severally, indemnify, defend and hold harmless, not only Bagley as the

Purchaser but also the Trust as "*Purchaser's permitted successors and assigns,*" from "all

losses, damages, liabilities or expenses (including reasonable attorneys' fees and expenses), that arise from any breach of a representation or warranty, any breach or default in performance, and any fraud, fraud in the inducement or misrepresentation" regarding the SPA. (Doc. # 164, Ex. 1 at 18, ¶ 6.3) (emphasis added). Thus, NSG's standing argument is not a simple matter of an assignable personal right. Rather, the question of Bagley Family Trust's standing to seek damages against NSG for breach of the SPA is inextricably entwined with the indemnification provisions contained therein. Because the parties have not sought summary judgment on the merits of the underlying claims, summary judgment on the indemnification issues is also precluded. Consequently, the court should not, and will not, attempt to parse the issues at this juncture.

In posing its second question, NSG seeks a pretrial determination of how damages will be measured should Bagley Family Trust prevail on any of its claims.[36]  FED.R.CIV.P. 56 was amended in 2010 to permit a party to move for summary judgment on only a part of a claim or defense. *See* FED.R.CIV.P. 56(a), Advisory Committee Notes, 2010 Amendments. While FED.R.CIV.P. 56(g) permits the court to entertain the issues raised by NSG at the

---

[36] *See* Doc. # 166 at 17 ("assuming Bagley Trust can prevail in proving any breach of the SPA, its measure of damages would necessarily be in relation to the decrease in MA's stock price, measured as of the date of closing using a "before/after" test.); at 18 ("Assuming (for the sake of argument) that Bagley Trust can factually prove some breach of warranty by the Sellers, its damages are not unlimited."); at 19 ("Based on discovery to date, NSG anticipates that Bagley Trust, despite being only an Assignee of shares, will take a "kitchen sink" approach to damages."); at 26 ("Assuming that the Trust can prove a breach of the SPA, the damage to the Trust is the difference in value by such breach (and not by other factors) between the purchase price of the shares of MA, and the actual fair market value of the shares as of the date of the SPA."); at 27 ("Having addressed the extent of the Trust's standing to sue NSG as assignee of the SPA, and the proper measure of damages for any breach, NSG now turns to why certain other damage claims which NSG expects Bagley Trust to assert are non-recoverable as a matter of law.").

summary judgment stage, in the circumstances of this particular case, the court declines to exercise its discretion to do so, primarily because NSG's motion for partial summary judgment is premature.

The SPA provides that Bagley Family Trust would be held harmless "from and against all losses, damages, liabilities, or expenses (including reasonable attorney's fees and expenses) for any fraud or misrepresentation." According to Bagley Family Trust, the proper measure of damages includes a return of the $3,660,000 it paid for the 61 shares of MA, reimbursement of $9,500,000 it paid to remove NSG as MA's loan guarantor, return of $560,000 it paid NSG as a guarantee fee, amounts paid into MA as operating funds, $1,700,00 it paid for non-existent inventory/receivables, and reasonable attorney's fees. NSG contends that the indemnity provision does not extend to the losses detailed by Bagley Family Trust.[37]

Section 6.3.3 of the SPA reads:

any fraud, fraud in the inducement or misrepresentation by any of the Sellers as regards (i) this Agreement or (ii) any of the agreements to be executed and delivered pursuant to this Agreement.

It is not until Bagley Trust is successful on its claims, that the issue of damages even

---

[37] In its supplemental brief on the issue of derivative claims, NSG argues that Bagley Family Trust claims are derivative to MA, and attached additional evidentiary material in support of its position. *See* Doc. # 188. NSG has not previously asserted that Bagley Family Trust's claims were derivative, and Bagley Family Trust filed a motion to strike NSG's brief and evidentiary material. (Doc. # 190). The court will not permit NSG to raise a new ground for summary judgment in a supplemental brief directed at a very limited issue, and nor will the court permit or consider new evidentiary material at this late date. *See Gilmour,* 382 F.3d at 1315. Bagley Family Trust's motion to strike will be granted in part.

arises.  Once liability has been established, an award of damages would then necessitate a determination regarding indemnification under the SPA. However, if Bagley Family Trust is unsuccessful on its claims, then damages and indemnification become moot points.

Furthermore, there are genuine disputes of material facts related to the extent of the Bagley Family Trust's claims for damages in this case, including how the stock purchase price was calculated and how the earn-out provision developed.  For example, NSG contends that Bagley Family Trust's standing is limited to rights assigned to it by Bagley.  (Doc. # 166 at 16-18).  Bagley Family Trust, on the other hand, asserts that it was the direct purchaser of the MA stock and all the parties knew the Bagley Family Trust was the entity purchasing the shares from NSG and the Cash brothers.  (Doc. # 166 at 4-8; Doc. # 164, Ex. 1 at 1; Ex. 12 at ¶ (a)).

Finally, the Supreme Court has acknowledged that, "even in the absence of a factual dispute, a district court has the power to 'deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255.  *See also United States v. Certain Real and Personal Prop. Belonging to Hayes*, 943 F.2d 1292 (11th Cir. 1991) ("A trial court is permitted, in its discretion, to deny even a well-supported motion for summary judgment, if it believes the case would benefit from a full hearing.").  Because this case is going to trial, the court concludes "that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event."  FED.R.CIV.P. 56(g), Advisory Committee Notes, 2010

Amendments. Thus, at this juncture, NSG's motion for partial summary judgment is due to be denied.

## IV. CONCLUSION

For the reasons as stated, and for good cause, it is the RECOMMENDATION of the Magistrate Judge that the Bagley Family Trust's motion for summary judgment (doc. # 164) on counts two, three and four of NSG's amended intervenor complaint be GRANTED, and that NSG's motion for partial summary judgment (doc. # 166) be DENIED. It is also

ORDERED that the plaintiffs' motion to strike (doc. # 190) be and is hereby GRANTED in part in that NSG's arguments that Bagley Family Trust claims are derivative to MA and its evidentiary submission be and are hereby STRICKEN. In all other respects, the motion to strike is DENIED. Finally, it is

ORDERED that the parties shall file any objections to the said Recommendation on or before **June 4, 2012**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain

error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982)*.  See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 21st day of May, 2012.


_____/s/Charles S. Coody_____
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE

40